*Westlaw.*

2006 WL 242465                                                              Page 1
--- F.Supp.2d ----, 2006 WL 242465 (D.Nev.)
**(Cite as: 2006 WL 242465 (D.Nev.))**

Only the Westlaw citation is currently available.


United States District Court,
D. Nevada.
Blake A. FIELD, Plaintiff,
v.
GOOGLE INC., Defendant.
And Related Counterclaims.
**No. CV-S-04-0413-RCJ-LJL.**

Jan. 19, 2006.

**Background:** Author brought copyright infringement action against operator of Internet search engine, seeking statutory damages and injunctive relief and alleging that operator violated his exclusive rights to reproduce and distribute copies of his works by allowing Internet users to access copies stored in online repository. Parties cross-moved for summary judgment.

 **Holdings:** The District Court, Jones, J., held that:

 (1) operator did not directly infringe on author's copyrighted works;

 (2) author granted operator implied license to display "cached" links to web pages containing his copyrighted works;

 (3) author was estopped from asserting copyright infringement claim against operator;

 (4) fair use doctrine protected operator's use of author's works; and

 (5) search engine fell within protection of safe harbor provision of Digital Millennium Copyright Act (DMCA).
 Summary judgment for operator.


**[1] Copyrights and Intellectual Property**
**⊙═67.3**

99k67.3 Most Cited Cases
Under Copyright Act, operator of Internet search engine did not directly infringe on author's copyrighted works, which were published on author's personal website, as a result of search engine users clicking on "cached" links to web pages containing author's works and downloading copies of those pages from operator's computers, inasmuch as it was users, not operator, who created and downloaded copies of cached web pages, while operator remained passive in such process, with its computers responding automatically to users' requests. 17 U.S.C.A. § 501.


**[2] Copyrights and Intellectual Property**
**⊙═51**

99k51 Most Cited Cases
To demonstrate copyright infringement, plaintiff must show ownership of the copyright and copying by defendant. 17 U.S.C.A. § 501.


**[3] Copyrights and Intellectual Property**
**⊙═52**

99k52 Most Cited Cases
Plaintiff must show volitional conduct on defendant's part to support finding of direct copyright infringement. 17 U.S.C.A. § 501.


**[4] Copyrights and Intellectual Property**
**⊙═48**

99k48 Most Cited Cases
Author granted operator of Internet search engine implied license to display "cached" links to web pages containing his copyrighted works when author consciously chose not to include no-archive meta-tag on pages of his website, despite knowing that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 242465                                                                                          Page 2
--- F.Supp.2d ----, 2006 WL 242465 (D.Nev.)
**(Cite as: 2006 WL 242465 (D.Nev.))**

including meta-tag would have informed operator not to display "cached" links to his pages and that absence of meta-tag would be interpreted by operator as permission to allow access to his web pages via "cached" links.

**[5] Copyrights and Intellectual Property** ☞75

99k75 Most Cited Cases
A license is a defense to a claim of copyright infringement.

**[6] Copyrights and Intellectual Property** ☞48

99k48 Most Cited Cases
Copyright owner may grant a nonexclusive license expressly or impliedly through conduct.

**[7] Copyrights and Intellectual Property** ☞48

99k48 Most Cited Cases
Implied license can be found when copyright holder engages in conduct from which user may properly infer that holder consents to his use.

**[8] Copyrights and Intellectual Property** ☞48

99k48 Most Cited Cases
Consent to use copyrighted work giving rise to implied license need not be manifested verbally, and may be inferred based on silence when copyright holder knows of the use and encourages it.

**[9] Copyrights and Intellectual Property** ☞75

99k75 Most Cited Cases
Author was estopped from asserting copyright infringement claim against operator of Internet search engine, based on search engine's use of "cached" links to allow access to author's copyrighted works

published on his Internet website, given that author knew that search engine would automatically allow
access to his works through "cached" links, unless he instructed otherwise, when he posted works on Internet, author intended for operator to rely upon his silence respecting his unstated desire not to have "cached" links to his website, operator was unaware of author's wish that it not provide "cached" links to his work, and operator, which would have honored author's wishes and thus avoided author's lawsuit, relied to its detriment upon his silence.

**[10] Copyrights and Intellectual Property** ☞75

99k75 Most Cited Cases
Plaintiff is estopped from asserting a copyright claim if he has aided defendant in infringing or otherwise induced it to infringe, or has committed covert acts such as holding out by silence or inaction.

**[11] Copyrights and Intellectual Property** ☞75

99k75 Most Cited Cases
To prevail on estoppel defense to copyright infringement claim, alleged infringer must prove four elements: (1) copyright holder knew of allegedly infringing conduct, (2) copyright holder intended that alleged infringer rely upon his conduct or acted so that alleged infringer had a right to believe it was so intended, (3) alleged infringer was ignorant of true facts, and (4) alleged infringer detrimentally relied upon copyright holder's conduct.

**[12] Copyrights and Intellectual Property** ☞67.3

99k67.3 Most Cited Cases
To the extent that operator of Internet search engine copied or distributed copyrighted works published on author's Internet website

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 242465                                                                    Page 3
--- F.Supp.2d ----, 2006 WL 242465 (D.Nev.)
**(Cite as: 2006 WL 242465 (D.Nev.))**

by allowing access to works through "cached" links, fair use doctrine protected that use, in that search engine served different and socially important purposes in offering access to works through cached links and did not merely supersede objectives of original works, such that its use was transformative, there was no evidence that operator profited from use of author's works, author sought to make his works available to widest possible audience for free, operator used no more of works than necessary, there was no evidence that cached links had impact on potential market for author's works, and operator acted in good faith in providing cached links to web pages. 17 U.S.C.A. § 107.

**[13] Copyrights and Intellectual Property**
☞53.2
99k53.2 Most Cited Cases
"Fair use" doctrine creates a limited privilege in those other than the owner of a copyright to use the copyrighted material in a reasonable manner without the owner's consent, and permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster. 17 U.S.C.A. § 107.

**[14] Copyrights and Intellectual Property**
☞53.2
99k53.2 Most Cited Cases
In determining whether a particular use of copyrighted work qualifies as a fair use under Copyright Act, court analyzes at least four factors, including (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes, (2) the nature of the copyrighted work, (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole, and (4) the effect of the use upon the

potential market for or value of the copyrighted work; court must balance these factors in light of the objectives of copyright law, rather than view them as definitive or determinative tests. 17 U.S.C.A. § 107.

**[15] Copyrights and Intellectual Property**
☞53.2
99k53.2 Most Cited Cases
If a use of copyrighted work is found to be transformative, the commercial nature of the use is of less importance in analyzing the purpose and character of use when determining whether it falls within fair use doctrine. 17 U.S.C.A. § 107.

**[16] Copyrights and Intellectual Property**
☞53.2
99k53.2 Most Cited Cases
Even copying of entire copyrighted works should not weigh against a fair use finding when the new use serves a different function from the original, and the original work can be viewed by anyone free of charge. 17 U.S.C.A. § 107.

**[17] Copyrights and Intellectual Property**
☞53.2
99k53.2 Most Cited Cases
Fourth factor of test for applying fair use doctrine, which considers effect of defendant's use upon potential market for copyright owner's work, only considers impact on markets that creators of original works would in general develop or license others to develop. 17 U.S.C.A. § 107.

**[18] Copyrights and Intellectual Property**
☞53.2
99k53.2 Most Cited Cases
When there is no likely market for challenged use of copyright owner's works, factor of test for applying fair use doctrine that considers effect of defendant's use upon potential market for owner's work favors

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 242465                                                    Page 4
--- F.Supp.2d ----, 2006 WL 242465 (D.Nev.)
**(Cite as: 2006 WL 242465 (D.Nev.))**

defendant. 17 U.S.C.A. § 107.

**[19] Copyrights and Intellectual Property**
🔑89(2)
99k89(2) Most Cited Cases
Author's motion for summary judgment that operator of Internet search engine was not entitled to protection under copyright safe harbors afforded to online service providers by Digital Millennium Copyright Act (DMCA) did not satisfy rule governing motions for summary judgment, given author's failure to discuss those safe harbors and explain why operator could not rely upon them. 17 U.S.C.A. § 512(a, c, d); Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[20] Copyrights and Intellectual Property**
🔑75
99k75 Most Cited Cases
Internet search engine made "intermediate and temporary storage" of material stored in its cache, within meaning of safe harbor provision of Digital Millennium Copyright Act (DMCA) precluding online service provider's liability for monetary relief for copyright infringement based on intermediate and temporary storage of material on system or network controlled or operated by or for service provider, given that search engine's cache was repository of material that operated between individuals posting the information and end-user requesting it, and that copies of web pages stored by search engine in its cache were present for approximately 14 to 20 days. 17 U.S.C.A. § 512(b)(1).

**[21] Copyrights and Intellectual Property**
🔑75
99k75 Most Cited Cases
As required to qualify for safe harbor provision of Digital Millennium Copyright Act (DMCA) precluding online service provider's liability for monetary relief for copyright infringement based on intermediate and temporary storage of material on system or network controlled or operated by or for service provider, cache system of Internet search engine satisfied requirement that allegedly infringed material be transmitted from person making it available online to some other person at the direction of such other person, given that author alleging that cache system infringed his copyrights transmitted pages of his website containing copyrighted works to search engine's automated cataloging system at search engine's request. 17 U.S.C.A. § 512(b)(1)(B).

**[22] Copyrights and Intellectual Property**
🔑75
99k75 Most Cited Cases
As required for Internet search engine's cache to satisfy safe harbor provision of Digital Millennium Copyright Act (DMCA) precluding online service provider's liability for monetary relief for copyright infringement based on intermediate and temporary storage of material on system or network controlled or operated by or for service provider, search engine's storage of web pages was carried out through automated technical process for the purpose of making material available to users who requested access to material from originating site, in that one of principal purposes of including web pages in cache was to enable subsequent users to access those pages if unsuccessful in requesting materials from originating site. 17 U.S.C.A. § 512(b)(1)(C).

Blake A. Field, Las Vegas, NV, pro se.

David Kramer, Michael B. Levin, William O'Callaghan, Lance Kavanaugh, William O'Callaghan, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA, Kelly Evans, Snell & Wilmer, Las Vegas, NV, for Defendant.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 242465                                                           Page 5
--- F.Supp.2d ----, 2006 WL 242465 (D.Nev.)
**(Cite as: 2006 WL 242465 (D.Nev.))**

FINDINGS OF FACT AND
CONCLUSIONS OF LAW & ORDER

JONES, District Court J.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

 *1  This is an action for copyright infringement brought by plaintiff Blake Field ("Field") against **Google** Inc. **("Google")**. Field contends that by allowing Internet users to access copies of 51 of his copyrighted works stored by **Google** in an online repository, **Google** violated Field's exclusive rights to reproduce copies and distribute copies of those works. On December 19, 2005, the Court heard argument on the parties' cross-motions for **summary judgment**.

 Based upon the papers submitted by the parties and the arguments of counsel, the Court finds that **Google** is entitled to judgment as a matter of law based on the undisputed facts. For the reasons set forth below, the Court will grant **Google's** motion for **summary judgment**: (1) that it has not directly infringed the copyrighted works at issue; (2) that **Google** held an implied license to reproduce and distribute copies of the copyrighted works at issue; (3) that Field is estopped from asserting a copyright infringement claim against **Google** with respect to the works at issue in this action; and (4) that **Google's** use of the works is a fair use under 17 U.S.C. § 107. The Court will further grant a partial **summary judgment** that Field's claim for damages is precluded by operation of the "system cache" safe harbor of Section 512(b) of the Digital Millennium Copyright Act ("DMCA"). Finally, the Court will deny Field's cross-motion for **summary judgment** seeking a finding of infringement and seeking to dismiss the **Google** defenses set forth above.

STATEMENT OF PROCEDURAL
HISTORY & UNDISPUTED FACTS
Procedural History
 1. On April 6, 2004, Plaintiff Field, an author and an attorney who is a member of the State Bar of Nevada, filed a complaint against Google asserting a single claim for copyright infringement based on Google's alleged copying and distribution of his copyrighted work entitled *Good Tea.* Field himself had previously published this work on his personal Web site, www.blakeswritings.com.

 2. On May 25, 2004, Field filed an Amended Complaint, alleging that Google infringed the copyrights to an additional fifty of Field's works, which likewise had been published on his personal website. Field did not seek actual damages, but instead requested $2,550,000 in statutory damages ($50,000 for each of fifty-one registered copyrighted works) along with injunctive relief.

 3. On September 27, 2005, Field filed a motion for **summary judgment** that **Google** infringed the copyrighted works at issue and that **Google's** defenses based on fair use, implied license, estoppel and the Digital Millennium Copyright Act ("DMCA") should be dismissed as a matter of law. **Google** filed a motion for **summary judgment** based on non-infringement, implied license, estoppel and fair use (Docket No. 51).

 4. On December 19, 2005, the Court held a hearing on the parties' cross-motions for **summary judgment**. At the hearing, **Google** made an oral cross-motion for partial **summary judgment** in its favor

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 242465                                                                      Page 6
--- F.Supp.2d ----, 2006 WL 242465 (D.Nev.)
**(Cite as: 2006 WL 242465 (D.Nev.))**

based upon Section 512(b) of the DMCA.

**\*2** 5. After considering the arguments of counsel, the Court granted **Google's** motion for **summary judgment** on each of the grounds it set forth, granted **Google's** oral cross-motion based on the DMCA and denied Field's motion for **summary judgment**.

Undisputed Facts

Google, the Google Cache, and "Cached" Links.

6. Google maintains one of the world's largest and most popular Internet search engines, accessible, among other places, on the World Wide Web at www.google.com. See Brougher Decl. ¶ 2. Internet search engines like Google's allow Internet users to sift through the massive amount of information available on the Internet to find specific information that is of particular interest to them. See id. ¶ 3; see also Levine Report ¶ 13. [FN1]

7. There are billions of Web pages accessible on the Internet. It would be impossible for Google to locate and index or catalog them manually. *See* Brougher Decl. ¶ ¶ 3-4; *see also* Levine Report ¶ ¶ 13-14. Accordingly, Google, like other search engines, uses an automated program (called the "Googlebot") to continuously crawl across the Internet, to locate and analyze available Web pages, and to catalog those Web pages into Google's searchable Web index. *See* Brougher Decl. ¶ ¶ 4-5; *see also* Levine Report ¶ 14.

8. As part of this process, Google makes and analyzes a copy of each Web page that it finds, and stores the HTML code from those pages in a temporary repository called a cache. *See* Levine Report ¶ 14; Brougher

Decl. ¶ 5. Once Google indexes and stores a Web page in the cache, it can include that page, as appropriate, in the search results it displays to users in response to their queries. *See* Brougher Decl. ¶ 5.

9. When Google displays Web pages in its search results, the first item appearing in each result is the title of a Web page which, if clicked by the user, will take the user to the online location of that page. The title is followed by a short "snippet" from the Web page in smaller font. Following the snippet, Google typically provides the full URL for the page. Then, in the same smaller font, Google often displays another link labeled "Cached." *See* Brougher Decl. ¶ 10. [FN2]

10. When clicked, the "Cached" link directs an Internet user to the archival copy of a Web page stored in Google's system cache, rather than to the original Web site for that page. *See* Brougher Decl. ¶ 8. By clicking on the "Cached" link for a page, a user can view the "snapshot" of that page, as it appeared the last time the site was visited and analyzed by the Googlebot. *See id.*

11. The page a user retrieves from Google after clicking on a "Cached" link contains a conspicuous disclaimer at the top explaining that it is only a snapshot of the page from Google's cache, not the original page, and that the page from the cache may not be current. *See* Brougher Decl. ¶ ¶ 11-12 & Ex. 2 ("Google's cache is the snapshot that we took of the page as we crawled the Web. The page may have changed since that time."). The disclaimer also includes two separate hyperlinks to the original, current page. *See id.*

**\*3** 12. Google has provided "Cached" links with its search results since 1998. *See* Brougher Decl. ¶ 7. Until this action,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 242465                                                                    Page 7
--- F.Supp.2d ----, 2006 WL 242465 (D.Nev.)
**(Cite as: 2006 WL 242465 (D.Nev.))**

Google had never before been sued for providing "Cached" links. *See* Macgillivray Decl. ¶ 3. The "Cached" link, and the consequences that flow when a user clicks on it, is the subject of Field's lawsuit.

The Purposes Served By Google's "Cached" Links

13. Google enables users to access its copy of Web pages through "Cached" links for several reasons.

14. *Archival Copies.* Google's "Cached" links allow users to view pages that the user cannot, for whatever reason, access directly. A Web page can become inaccessible to Internet users because of transmission problems, because nations or service providers seek to censor certain information, because too many users are trying to access the same page at the same time, or because the page has been removed from its original location. *See* Levine Report ¶ ¶ 17-19. In each case, users who request access to the material from the inaccessible site are still able to access an archival copy of the page via the "Cached" link in Google's search results. *See* Levine Report ¶ ¶ 17-19; *see also* Brougher Decl. ¶ 14. Google's users, including those in academia, describe this functionality as highly valuable. *See* Levine Decl. ¶ 4 & Exs. 2-5. [FN3] This feature also benefits Web site publishers because it allows users to access their sites when the sites are otherwise unavailable and has allowed Web site owners to recover copies of their own sites that might otherwise have been lost due to computer problems. *See* Levine Report ¶ ¶ 16-19; *see also* Levine Decl., Ex. 7 at 2.

15. *Web Page Comparisons.* Google's archival functionality is also of considerable importance to those who wish to determine how a particular Web page has been altered over time. By examining Google's copy of the page, people can identify subtle but potentially significant differences between the current version of a page, and the page as it existed when last visited by the Googlebot. *See* Levine Report ¶ 20; *see also* Brougher Decl. ¶ 15; Levine Decl., Exs. 10, 11.

16. *Identification of Search Query Terms.* Google's "Cached" links also allow users to immediately determine why a particular page was deemed responsive to their search query, by highlighting the terms from the user's query as they appear on the page. *See* Levine Report ¶ 17; *see also* Brougher Decl. ¶ 16. In some cases, if a user clicks on Google's link to an original Web page, he may be unable to determine how the page relates to his inquiry. That is particularly true for text intensive pages where the user's search term may be very difficult to find. *See* Levine Report ¶ 17; *see also* Levine Decl., Ex. 13 at 1. In some cases it may be impossible for a user to find the information on a page that is responsive to a given search where a site owner has altered the text on the original page and removed the relevant language. *See* Levine Report ¶ 17; *see also* Brougher Decl. ¶ 16. By allowing access to copies of Web pages through "Cached" links, Google enables users to more quickly determine whether and where a user's search query appears, and thus whether the page is germane to their inquiry.

*4 17. Given the breadth of the Internet, it is not possible for Google (or other search engines) to personally contact every Web site owner to determine whether the owner wants the pages in its site listed in search results or accessible through "Cached" links. *See* Brougher Decl. ¶ 18; *see also* Levine Report ¶ 25.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 242465                                                                                    Page 8
--- F.Supp.2d ----, 2006 WL 242465 (D.Nev.)
**(Cite as: 2006 WL 242465 (D.Nev.))**

18. The Internet industry has developed a set of widely recognized and well-publicized industry standard protocols by which Web site owners can automatically communicate their preferences to search engines such as Google. *See* Levine Report ¶ ¶ 25, 29, 35 (listing sources that document these standards); Brougher Decl. ¶ ¶ 18-21. Google provides instructions for Web site owners to communicate their preferences to Google at *http:// www.google.com/remove.html. See* Levine Report ¶ ¶ 30, 35; Brougher Decl. ¶ ¶ 18-21; O'Callaghan Decl. Ex. 5; *see also id.* Exs. 4, 6.

19. A principal way for Web site owners to communicate with Google's robot is by placing specific instructions in "meta-tags" within the computer code (called HTML) that comprises a given page. When the Googlebot visits a page, it reads through this code. If it encounters meta-tags, it follows the instructions provided. Thus, for example, a site owner can place the following meta-tag within a page to tell Google's robot not to analyze the page or include it in Google's Web index and search results: "<META NAME="ROBOTS" CONTENT="NOINDEX, NOFOLLOW">" *See* Brougher Decl. ¶ 20; *see also* Levine Report ¶ 33. [FN4]

20. Using meta-tags, a Web site owner can also tell Google's robot that it can include a given page in Google's index, but that it should not provide a "Cached" link to that page in Google's search results. To do so, the Web site owner uses a "no-archive" meta-tag "<META NAME="ROBOTS" CONTENT="NOARCHIVE">" *See* Brougher Decl. ¶ 21; *see also* Levine Report ¶ 35. The "no-archive" meta-tag has been a widely recognized industry standard

for years. *See* Levine Report ¶ 35.

21. If a Web site owner includes the "no-archive" meta-tag on a page, then Google does not provide a "Cached" link when it lists that page in its search results. *See* Brougher Decl. ¶ ¶ 21-22. [FN5]

22. Web site owners can also communicate with search engines' robots by placing a "robots.txt" file on their Web site. *See* Brougher Decl. ¶ 19; *see also* Levine Report ¶ 29. For example, if the Web site owner does not want robots to crawl the owner's Web site, the owner can create a robots.txt file with the following text: "User-agent: * Disallow: /". *See* Brougher Decl. ¶ 19; *see also* Levine Report ¶ 29. The above text tells the robots that they should not crawl the owner's Web site. *See* Brougher Decl. ¶ 19; *see also* Levine Report ¶ 29. [FN6] If Google's robot encounters a robots.txt file with the above text, then it will not crawl the Web site, and there will be no entry for that Web page in Google's search results and no cached link. *See* Brougher Decl. ¶ 19. The Internet industry has widely recognized the robots.txt file as a standard for controlling automated access to Web pages since 1994. *See* Levine Report ¶ 29.

Plaintiff Blake Field and His Copyright Claim

**\*5** 23. Plaintiff Blake Field has regularly used Google's search engine over the past several years and was familiar with the manner in which it operates. *See* Field Dep. at 103:15-20. [FN7]

24. Field has long been aware that Google automatically provides "Cached" links for pages that are included in its index and search results unless instructed otherwise.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 242465                                                                    Page 9
--- F.Supp.2d ----, 2006 WL 242465 (D.Nev.)
**(Cite as: 2006 WL 242465 (D.Nev.))**

*See id.* at 74:8-22, 109:22-110:6. Field decided to manufacture a claim for copyright infringement against Google in the hopes of making money from Google's standard practice. *See id.* at 79:8-15, 141:15-24.

25. Field admits he knew that any Web site owner could instruct Google not to provide a "Cached" link to a given Web page by using the "no-archive" meta-tag (as discussed above). *See* Field Dep. at 74:8-22, 81:13-17. Field also knew that Google provided a process to allow Web site owners to remove pages from Google's system cache. *See id.* at 81:18-21, 83:4-11, 84:15-21; O'Callaghan Decl. Ex. 3 at 1-2 (Pl.'s Resp. to Req. for Admis. Nos. 1, 4). With this knowledge, Field set out to get his copyrighted works included in Google's index, and to have Google provide "Cached" links to Web pages containing those works.

26. Over a three-day period in January 2004, Field created the 51 works at issue in this lawsuit. *See* O'Callaghan Decl. Ex. 2 (Pl.'s Resp. to Interrog. No. 5).

27. Field registered copyrights for each of these works separately on January 16, 2004. *See* First Am. Compl. ¶ 7. Field then created a Web site at www.blakeswritings.com and published his works on pages where they were accessible, for free, to the world starting in late January 2004. *See* Field Dep. at 45:2-4, 94:10-19.

28. Field created a robots.txt file for his site and set the permissions within this file to *allow* all robots to visit and index all of the pages on the site. *See* Field Dep. at 46:10-16; Levine Report ¶ 31. Field created the robots.txt file because he wanted search engines to visit his site and include the site within their search results. *See* Field Dep. at

46:2-4, 17-23.

29. Field knew that if he used the "no-archive" meta-tag on the pages of his site, Google would not provide "Cached" links for the pages containing his works. *See* Field Dep. at 81:13-17; O'Callaghan Decl. Ex. 3 at 2 (Resp. to Req. for Admis. No. 4). Field consciously chose not to use the "no-archive" meta-tag on his Web site. *See* Field Dep. at 83:25-84:3.

30. As Field expected, the Googlebot visited his site and indexed its pages, making the pages available in Google search results. When the pages containing Field's copyrighted works were displayed in Google's search results, they were automatically displayed with "Cached" links, as Field intended they would be.

31. According to Google's records, an individual or individuals clicked on the "Cached" links for each of the pages containing Field's works, and retrieved copies of each of the those pages from Google's system cache.

**\*6** 32. When Google learned that Field had filed (but not served) his complaint, Google promptly removed the "Cached" links to all of the pages of his site. *See* MacGillivray Decl. ¶ 2; *see also* Countercls. ¶ 22; Ans. to Countercls. ¶ 22. Google also wrote to Field explaining that Google had no desire to provide "Cached" links to Field's pages if Field did not want them to appear. *See* O'Callaghan Decl. Ex. 7.

CONCLUSIONS OF LAW
Legal Standard for Summary Judgment
A court must grant summary judgment if the pleadings and supporting documents, when viewed in the light most favorable to the non-moving party, "show that there is no

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 242465                                                                    Page 10
--- F.Supp.2d ----, 2006 WL 242465 (D.Nev.)
**(Cite as: 2006 WL 242465 (D.Nev.))**

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue as to a material fact is only "genuine" if the evidence regarding the disputed fact is "such that a reasonable jury could return a verdict for the nonmoving party," and a dispute is "material" only if it could affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Discussion
I. Direct Infringement of the Copyrighted Works

[1] **Google** has filed a motion for **summary judgment** that by operating its cache and presenting "Cached" links to works within it, **Google** does not directly infringe Field's copyrighted works. Field has filed a cross-motion for **summary judgment** for a finding of direct infringement. The Court grants **Google's** motion and denies Field's motion. [FN8]

[2][3]    To    demonstrate    copyright infringement, "the plaintiff must show ownership of the copyright and copying by the defendant." *Kelly v. Arriba Soft Corp.,* 336 F.3d 811, 817 (9th Cir.2003); *see also* 17 U.S.C. § 501. A plaintiff must also show volitional conduct on the part of the defendant in order to support a finding of direct copyright infringement. *See Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.,* 907 F.Supp. 1361, 1369-70 (N.D.Cal.1995) (direct infringement requires a volitional act by defendant; automated copying by machines occasioned by others not sufficient); *CoStar Group, Inc. v. LoopNet, Inc.,* 373 F.3d 544, 555 (4th Cir.2004) ("Agreeing with the analysis in Netcom, we hold that the automatic copying, storage, and transmission of copyrighted

materials, when instigated by others, does not render an ISP strictly liable for copyright infringement under § § 501 and 106 of the Copyright Act.").

 The parties do not dispute that Field owns the copyrighted works subject to this action. The parties do dispute whether by allowing access to copyrighted works through "Cached" links Google engages in volitional "copying" or "distribution" under the Copyright Act sufficient to establish a prima facie case for copyright infringement.

 Field does *not* allege that **Google** committed    infringement    when    its "Googlebot," like an ordinary Internet user, made the initial copies of the Web pages containing his copyrighted works and stores those copies in the **Google** cache. *See* Field Dep. at 143:13-144:1; 98:18-25. Instead, Field alleges that **Google** directly infringed his copyrights when a **Google** user clicked on a "Cached" link to the Web pages containing Field's copyrighted works and downloaded a copy of those pages from **Google's** computers. *See id.; see also* First Am. Compl. ¶ ¶ 29-32. According to Field, **Google** itself is creating and distributing copies of his works. But when a user requests a Web page contained in the **Google** cache by clicking on a "Cached" link, it is the user, not **Google,** who creates and downloads a copy of the cached Web page. **Google** is passive in this process. **Google's** computers respond automatically to the user's request. Without the user's request, the copy would not be created and sent to the user, and the alleged infringement at issue in this case would not occur. The automated,    non-volitional    conduct    by **Google** in response to a user's request does not constitute direct infringement under the Copyright Act. *See, e.g., Religious Tech. Ctr.,* 907 F.Supp. at 1369-70 (direct

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

infringement requires a volitional act by defendant; automated copying by machines occasioned by others not sufficient); *CoStar Group,* 373 F.3d at 555; *Sega Enters. Ltd v. MAPHIA,* 948 F.Supp. 923, 931-32 (N.D.Cal.1996). **Summary judgment** of non-infringement in **Google's** favor is thus appropriate.

II. Google's Defenses

 ***7 Google** and Field have filed cross-motions for **summary judgment** with respect to various defenses **Google** has asserted to Field's charge of direct copyright infringement. Assuming that by allowing users to access Field's copyrighted works through its "Cached" links **Google** is engaged in direct copyright infringement, the Court finds that **Google** has established four defenses to Field's copyright infringement claim.

 A. Implied License

 [4][5][6][7][8] A license is a defense to a claim of copyright infringement. *See Effects Assocs., Inc. v. Cohen,* 908 F.2d 555, 558-59 (9th Cir.1990). A copyright owner may grant a nonexclusive license expressly or impliedly through conduct. *See id.* (citing 3 Melville B. Nimmer & David Nimmer, *Nimmer On Copyright* § 10.03[A] (1989) (hereinafter "Nimmer")); *see also Quinn v. City of Detroit,* 23 F.Supp.2d 741, 749 (E.D.Mich.1998). An implied license can be found where the copyright holder engages in conduct "from which [the] other [party] may properly infer that the owner consents to his use." See, *e.g., De Forest Radio Tel. & Tel. Co. v. United States,* 273 U.S. 236, 241, 47 S.Ct. 366, 71 L.Ed. 625 (1927) (setting forth requirements for an implied license defense to a charge of patent infringement). Consent to use the copyrighted work need not be

manifested verbally and may be inferred based on silence where the copyright holder knows of the use and encourages it. *See Keane Dealer Servs., Inc. v. Harts,* 968 F.Supp. 944, 947 (S.D.N.Y.1997) ("consent given in the form of mere permission or lack of objection is also equivalent to a nonexclusive license"); *Quinn,* 23 F.Supp. at 753.

 According to the undisputed testimony of Google's Internet expert, Dr. John Levine, Web site publishers typically communicate their permissions to Internet search engines (such as Google) using "meta-tags." A Web site publisher can instruct a search engine not to cache the publisher's Web site by using a "no-archive" meta-tag. According to Dr. Levine, the "no-archive" meta-tag is a highly publicized and well-known industry standard. Levine Report ¶ ¶ 33-37. Field concedes he was aware of these industry standard mechanisms, and knew that the presence of a "no archive" meta-tag on the pages of his Web site would have informed Google not to display "Cached" links to his pages. Despite this knowledge, Field chose not to include the no-archive meta-tag on the pages of his site. He did so, knowing that Google would interpret the absence of the meta-tag as permission to allow access to the pages via "Cached" links. Thus, with knowledge of how Google would use the copyrighted works he placed on those pages, and with knowledge that he could prevent such use, Field instead made a conscious decision to permit it. His conduct is reasonably interpreted as the grant of a license to Google for that use. *See, e.g., Keane,* 968 F.Supp. at 947 (copyright owner's knowledge of defendant's use coupled with owner's silence constituted an implied license); *See also* Levine Report ¶ 37 (providing the undisputed expert opinion that Google reasonably interpreted absence

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2006 WL 242465 (D.Nev.)
**(Cite as: 2006 WL 242465 (D.Nev.))**

of meta-tags as permission to present "Cached' links to the pages of Field's site). Accordingly, the Court grants Google's motion that it is entitled to the defense of implied license, and denies Field's cross-motion that the defense is inapplicable.

 B. Estoppel

 **\*8** [9][10][11] A plaintiff is estopped from asserting a copyright claim "if he has aided the defendant in infringing or otherwise induced it to infringe or has committed covert acts such as holding out ... by silence or inaction." *See Quinn,* 23 F.Supp.2d at 753 (internal quotation marks omitted, citing 4 Nimmer § 13.07 (1990)). To prevail on its estoppel defense, Google must prove the following four elements:

 1. Field knew of Google's allegedly infringing conduct;
 2. Field intended that Google rely upon his conduct or acted so that Google had a right to believe it was so intended;
 3. Google was ignorant of the true facts; and
 4. Google detrimentally relied on Field's conduct.

 *See Carson v. Dynegy, Inc.,* 344 F.3d 446, 453 (5th Cir.2003) (citing 4 Nimmer § 13.07 (2002)). Here, all four elements have been established as a matter of law.

 First, Field knew of Google's allegedly infringing conduct well before any supposed infringement of his works took place. Field concedes that he knew that Google would automatically allow access to his works through "Cached" links when he posted them on the Internet unless he instructed otherwise. Field also knew that if an Internet user clicked on the "Cached" links to his web pages, the user would immediately download a copy of those pages from Google's system cache. Field was aware of

steps he could take to ensure that his web site would not be archived and not included in Google's cache. There is no dispute that Field was aware of the conduct that he challenges in this lawsuit.

 Second, Field remained silent regarding his unstated desire not to have "Cached" links provided to his Web site, and he intended for Google to rely on this silence. Field could have informed Google not to provide "Cached" links by using a "no archive" meta-tag or by employing certain commands in robots.txt file. Instead, Field chose to remain silent knowing that Google would automatically interpret that silence as permission to display "Cached" links. Field's silence, particularly given his knowledge of the consequences of that silence, satisfies the second estoppel factor.

 Third, Google was not aware that Field did not wish to have Google provide "Cached" links to his works. Macgillivray Decl. ¶ 2.

 Fourth, Google detrimentally relied on Field's silence. It is undisputed that if Google had known of Field's preference, it would not have presented "Cached" links to Field's pages. *See* Macgillivray Decl. ¶ 2; *see also* O'Callaghan Decl. Ex. 7. Google honors copyright holder's requests that it not display "Cached" links to their pages. Brougher Decl. ¶ 18. Google's reliance on Field's silence was to its detriment. Had Field communicated his preferences to Google, the parties would have avoided the present lawsuit entirely. *See Hadady Corp. v. Dean Witter Reynolds, Inc.,* 739 F.Supp. 1392, 1400 (C.D.Cal.1990) (ensuing litigation establishes prejudice to defendant).

 **\*9** Because the Court finds that all four estoppel factors are present based on the undisputed facts, the Court grants **Google's**

motion for **summary judgment** on the defense of estoppel and denies Field's cross-motion.

C. Fair Use

[12][13] "Fair use" of a copyrighted work "is not an infringement of copyright" under the Copyright Act. 17 U.S.C. § 107. The fair use doctrine "creates a limited privilege in those other than the owner of a copyright to use the copyrighted material in a reasonable manner without the owner's consent," *Fisher v. Dees,* 794 F.2d 432, 435 (9th Cir.1986), and "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1399 (9th Cir.1997) (internal quotation marks omitted).

[14] In analyzing whether a particular use qualifies as a "fair use," the Copyright Act directs a Court to analyze at least four factors:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107. The Court must "balance these factors in light of the objectives of copyright law, rather than view them as definitive or determinative tests." *See Kelly,*

336 F.3d at 818.

While no one factor is dispositive, courts traditionally have given the most weight to the first and fourth factors. *Compare Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 579, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (focusing primarily on first factor and whether use is transformative) and *Leibovitz v. Paramount Pictures Corp.,* 137 F.3d 109, 114-15 (2d Cir.1998) (affirming summary judgment of fair use for parody based primarily on the first fair use factor) with *Harper & Row, Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 566, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) ("[The fourth] factor is undoubtedly the single most important element of fair use.").

Based on a balancing of the relevant fair use factors, the Court finds that to the extent that Google itself copied or distributed Field's copyrighted works by allowing access to them through "Cached" links, Google engaged in a "fair use" of those copyrighted works.

1. Factor One: Purpose and Character of the Use.

a. The Google System Cache Serves A Different Purpose From That Of Plaintiff's Original Works

According to the United States Supreme Court, the fair use analysis largely turns on one question:

whether the new [use] merely "supersedes the objects" of the original creation ... or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is "transformative" ... Although such

2006 WL 242465                                                                    Page 14
--- F.Supp.2d ----, 2006 WL 242465 (D.Nev.)
**(Cite as: 2006 WL 242465 (D.Nev.))**

transformative use is not absolutely necessary for a finding of fair use, ... the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works.
 **\*10** *See* Campbell, 510 U.S. at 579 (citations omitted). In the seminal case of *Kelly v. Arriba Soft Corp.,* the Ninth Circuit determined that a search engine's use of copyrighted photographs was a transformative fair use based on the fact that the search engine used the photographs in question to "improv[e] access to information on the internet" while the original function of the work in question was artistic. *Kelly,* 336 F.3d at 819.

 Assuming that Field intended his copyrighted works to serve an artistic function to enrich and entertain others as he claims, Google's presentation of "Cached" links to the copyrighted works at issue here does not serve the same functions. For a variety of reasons, the "Cached" links "add[ ] something new" and do not merely supersede the original work.

 First, Google's cache functionality enables users to access content when the original page is inaccessible. The Internet is replete with references from academics, researchers, journalists, and site owners praising Google's cache for this reason. In these circumstances, Google's archival copy of a work obviously does not substitute for the original. Instead, Google's "Cached" links allow users to locate and access information that is otherwise inaccessible. *See Kelly,* 336 F.3d at 820 (finding search engine's use of copyrighted material transformative in part because it "benefit[ted] the public by enhancing information-gathering techniques on the internet").

 Second, providing "Cached" links allows

Internet users to detect changes that have been made to a particular Web page over time. *See, e.g.,* Levine Report ¶ 20. Such comparisons can reveal significant differences that have political, educational, legal or other ramifications. Again, by definition, this information location function cannot be served by the original Web page alone. To conduct such a comparison, a user would need to access both Google's archival copy of a Web page and the current form of the Web page on the Internet. *See id.* ¶ 22.

 Third, offering "Cached" links allows users to understand why a page was responsive to their original query. It is often difficult for users to locate their query terms within a given page, and may be impossible where the language of a page has been modified. Because it controls its archival copy, Google can automatically highlight the user's query in the copy that the user then retrieves. *See, e.g.,* Levine Report ¶ 17; Brougher Decl. ¶¶ 12, 16. By affording access to a page within its cache, Google enables users to determine whether and where the relevant language appears, and thus whether the page is truly germane to their inquiry. The objective of enabling users to more quickly find and access the information they are searching for is not served by the original page. *See Kelly,* 336 F.3d at 820.

 Fourth, Google utilizes several design features to make clear that it does not intend a "Cached" link of a page to substitute for a visit to the original page. In its search results, at the top of each listing, Google prominently features a link to the original Web page. By contrast, when "Cached" links are displayed, they are in a smaller font, and in a less conspicuous location. Further, after a user clicks on a "Cached" link, he sees a prominent disclaimer at the top of the page explaining that he is only

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2006 WL 242465 (D.Nev.)
**(Cite as: 2006 WL 242465 (D.Nev.))**

viewing a snapshot of the page from Google's cache. *See* Brougher Decl. ¶ 12 ("Google's cache is the snapshot that we took of the page as we crawled the web. The page may have changed since that time."). The disclaimer also includes two separate links away from the archival copy and to the original, current page. Accordingly, any user seeking to access the original page has more than ample opportunity to do so. There is no evidence in the record that Internet users accessed the pages containing Field's works via Google's "Cached" links in lieu of visiting those pages directly. *Cf.* Levine Report ¶ 23 ("[P]eople use the Google system cache as a complement to and not a substitute for the original.")

**\*11** Fifth, Google ensures that any site owner can disable the cache functionality for any of the pages on its site in a matter of seconds. *See, e.g.,* Brougher Decl. ¶ 21. Thus, site owners, and not Google, control whether "Cached" links will appear for their pages. The fact that the owners of billions of Web pages choose to permit these links to remain is further evidence that they do not view Google's cache as a substitute for their own pages.

Because Google serves different and socially important purposes in offering access to copyrighted works through "Cached" links and does not merely supersede the objectives of the original creations, the Court concludes that Google's alleged copying and distribution of Field's Web pages containing copyrighted works was transformative.

**b. Google's Status as a Commercial Enterprise Does Not Negate Fair Use**

[15] When a use is found to be transformative, the "commercial" nature of

the use is of less importance in analyzing the first fair use factor. *See Campbell,* 510 U.S. at 579 ("[Transformative] works thus lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright, ... and the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use."). *Kelly,* 336 F.3 at 818 (citation omitted). While Google is a for-profit corporation, there is no evidence Google profited in any way by the use of any of Field's works. Rather, Field's works were among *billions* of works in Google's database. *See, e.g.,* Levine Report ¶ 13; Brougher Decl. ¶ 3 (noting that there are billions of Web pages in the Google index). Moreover, when a user accesses a page via Google's "Cached" links, Google displays no advertising to the user, and does not otherwise offer a commercial transaction to the user. *See* Brougher Decl. ¶ 13; *see also* O'Callaghan Decl. Ex. 8 (screen capture showing that there was no Google advertising in Google's cache copy of Field's Web pages). The fact that Google is a commercial operation is of only minor relevance in the fair use analysis. The transformative purpose of Google's use is considerably more important, and, as in *Kelly,* means the first factor of the analysis weighs heavily in favor of a fair use finding.

**2. Factor Two: The Nature of the Copyrighted Works**

The second fair use factor looks to the nature of the plaintiff's work. When dealing with transformative uses, this factor has been described as "not ... terribly significant in the overall fair use balancing" (*see Mattel Inc. v. Walking Mountains Prods.,* 353 F.3d 792, 803 (9th Cir.2003)) and "not much help" (*see Campbell,* 510 U.S. at 586). The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 242465                                                                                                          Page 16
--- F.Supp.2d ----, 2006 WL 242465 (D.Nev.)
**(Cite as: 2006 WL 242465 (D.Nev.))**

Ninth Circuit in *Kelly* ruled that this factor weighed slightly in favor of the plaintiff where the copyrighted photographs at issue were "creative." However, the Court also noted that the photographs had been made available to the world for free on the plaintiff's own Web site. *See* Kelly, 336 F.3d at 820; *see also Diamond v. Am-Law Publ'g Corp.,* 745 F.2d 142 (2d Cir.1984) (finding fair use for a letter to the editor that was published in a modified form); *Salinger v. Random House, Inc.,* 811 F.2d 90, 95 (2d Cir.1987) (describing *Diamond* as "applying fair use to a letter to the editor of a newspaper, which, though not previously printed, was obviously intended for dissemination").

 **\*12** Even assuming Field's copyrighted works are as creative as the works at issue in *Kelly,* like Kelly, Field published his works on the Internet, thereby making them available to the world for free at his Web site. *See* First Am. Compl. ¶ ¶ 8, 10; *see also* Field Dep. at 94:10-19. Moreover, Field added a "robots.txt" file to his site to ensure that all search engines would include his Web site in their search listings. Field thus sought to make his works available to the widest possible audience for free. Accordingly, assuming the works at issue are creative, as in *Kelly,* the "nature" of the works weighs only slightly in Field's favor.

 3. Factor Three: The Amount and Substantiality of the Use

 [16] The third fair use factor looks at the amount of the work used. The Supreme Court has made clear that even copying of entire works should not weigh against a fair use finding where the new use serves a different function from the original, and the original work can be viewed by anyone free of charge:

[W]hen one considers the nature of a televised copyrighted audiovisual work ... and that *timeshifting merely enables a viewer to see such a work which he had been invited to witness in its entirety free of charge,* the fact that the entire work is reproduced... does not have its ordinary effect of militating against a finding of fair use.

 *See Sony Corp. v. Universal City Studios, Inc.,* 464 U.S. 417, 449-50, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984) (emphasis added; citations omitted) (affirming as a fair use the "timeshifting" of entire television shows). Similarly, the Ninth Circuit has held that "the extent of permissible copying varies with the purpose and character of the use" and that "[i]f the secondary user only copies as much as is necessary for his or her intended use, then this factor will not weigh against him or her." *See* Kelly, 336 F.3d at 820-21. The Ninth Circuit in *Kelly* thus concluded that the search engine's use of entire photographs was of no significance:

This factor neither weighs for nor against either party because, although Arriba did copy each of Kelly's images as a whole, it was reasonable to do so in light of Arriba's use of the images. It was necessary for Arriba to copy the entire image to allow users to recognize the image and decide whether to pursue more information about the image or the originating web site. If Arriba only copied part of the image, it would be more difficult to identify it, thereby reducing the usefulness of the visual search engine.

 *See* 336 F.3d at 821; *see also Mattel,* 353 F.3d at 803 n. 8 (holding that "entire verbatim reproductions are justifiable where the purpose of the work differs from the original").

 Just like the broadcasters in Sony and the photographer in *Kelly,* Field made his

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 242465                                                                                  Page 17
--- F.Supp.2d ----, 2006 WL 242465 (D.Nev.)
**(Cite as: 2006 WL 242465 (D.Nev.))**

content available to anyone, free of charge. Also like the fair uses in *Sony* and *Kelly,* Google's use of entire Web pages in its Cached links serves multiple transformative and socially valuable purposes. These purposes could not be effectively accomplished by using only portions of the Web pages. Without allowing access to the whole of a Web page, the Google Cached link cannot assist Web users (and content owners) by offering access to pages that are otherwise unavailable. Nor could use of less than the whole page assist in the archival or comparative purposes of Google's "Cached" links. Finally, Google's offering of highlighted search terms in cached copies of Web pages would not allow users to understand why a Web page was deemed germane if less than the whole Web page were provided. *See* Brougher Decl. ¶ ¶ 14-16; *see also* Levine Report ¶ ¶ 15-20. Because Google uses no more of the works than is necessary in allowing access to them through "Cached" links, the third fair use factor is neutral, despite the fact that Google allowed access to the entirety of Field's works. *See Sony,* 464 U.S. at 448; *Kelly,* 336 F.2d at 821.

4. Factor Four: The Effect of the Use upon the Potential Market for or Value of the Copyrighted Work

**\*13** The fourth fair use factor considers the effect of the defendant's use upon the potential market for the plaintiff's work. "[A] use that has no demonstrable effect upon the potential market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create." *See Sony,* 464 U.S. at 450.

[17][18] Here there is no evidence of any market for Field's works. Field makes the

works available to the public for free in their entirety, and admits that he has never received any compensation from selling or licensing them. *See* Field Dep. at 132:10-17. There is likewise no evidence that by displaying "Cached" links for pages from Field's site, Google had any impact on any potential market for those works. [FN9]

More generally, there is no evidence before the Court of any market for licensing search engines the right to allow access to Web pages through "Cached" links, or evidence that one is likely to develop. "Cached" links are simply one way that search engines enable end-users to obtain information that site owners make freely available to the world. There is compelling evidence that site owners would not demand payment for this use of their works. Notwithstanding Google's long-standing display of "Cached" links and the well-known industry standard protocols for instructing search engines not to display them, the owners of literally billions of Web pages choose to permit such links to be displayed. *See, e.g.,* Brougher Decl. ¶ ¶ 18-22. Sophisticated Internet publishers such as those operating Web sites for Disney, Sports Illustrated, America Online, ESPN and Readers' Digest all permit the display of "Cached" links to the pages of their sites though they could easily prevent it. *See id.* ¶ 26.

Because there is no evidence that Google's "Cached" links had any impact on the potential market for Field's copyrighted works, the fourth fair use factor weighs strongly in favor of a fair use determination. *See Kelly,* 336 F.3d at 821-22.

5. Additional Factor: Google's Good Faith in Operating Its System Cache Weighs In Favor Of Fair Use

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 242465                                                                                          Page 18
--- F.Supp.2d ----, 2006 WL 242465 (D.Nev.)
**(Cite as: 2006 WL 242465 (D.Nev.))**

The Copyright Act authorizes courts to consider other factors than the four non-exclusive factors discussed above. *See* 17 U.S.C. § 107 (noting court is to consider factors *including* four specifically listed). In particular, the Ninth Circuit has stated that courts may evaluate whether an alleged copyright infringer has acted in good faith as part of a fair use inquiry. *See Fisher, 794 F.2d at 436-37* ("Because 'fair use presupposes "good faith" and "fair dealing," ' courts may weigh the 'propriety of the defendant's conduct' in the equitable balance of a fair use determination.") (citation omitted). The fact that Google has acted in good faith in providing "Cached" links to Web pages lends additional support for the Court's fair use finding.

Google does not provide "Cached" links to any page if the owner of that page does not want them to appear. Google honors industry-standard protocols that site owners use to instruct search engines not to provide "Cached" links for the pages of their sites. *See, e.g.,* Brougher Decl. ¶ ¶ 18-22. Google also provides an explanation on its Web site of how to deploy these industry-standard instructions, and provides an automated mechanism for promptly removing "Cached" links from Google's search results if the links ever appear. *See id.; see also* O'Callaghan Decl. Ex. 5. Moreover, Google takes steps to ensure that users seeking an original Web page through Google's search engine can easily access it, and that any user viewing a page from Google's cache knows that it is not the original.

**\*14** Google's good faith is manifest with respect to Field's works in particular. Field did not include any information on the pages of his site to instruct Google not to provide "Cached" links to those pages. Google only learned that Field objected to the "Cached"

links by virtue of discovering Field's Complaint in this litigation. At the time, Field had not even served the Complaint. Nevertheless, without being asked, Google promptly removed the "Cached" links to the pages of Field's site. *See* Macgillivray Decl. ¶ 2.

Field's own conduct stands in marked contrast to Google's good faith. Field took a variety of affirmative steps to get his works included in Google's search results, where he knew they would be displayed with "Cached" links to Google's archival copy and he deliberately ignored the protocols that would have instructed Google not to present "Cached" links.

Comparing Field's conduct with **Google's** provides further weight to the scales in favor of a finding of fair use. *See Campbell, 510 U.S. at 585 n. 18; Bill Graham Archives LLC v. Dorling Kindersley Ltd., 75 U.S.P.Q.2d 1192, 1199-1200 (S.D.N.Y. May 11, 2005)* (granting **summary judgment** of fair use based in part on defendant's good faith).

In summary, the first fair use factor weighs heavily in Google's favor because its "Cached" links are highly transformative. The second fair use factor weighs only slightly against fair use because Field made his works available in their entirety for free to the widest possible audience. The third fair use factor is neutral, as Google used no more of the copyrighted works than was necessary to serve its transformative purposes. The fourth fair use factor cuts strongly in favor of fair use in the absence of any evidence of an impact on a potential market for Field's copyrighted works. A fifth factor, a comparison of the equities, likewise favors fair use. A balance of all of these factors demonstrates that if Google copies or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2006 WL 242465 (D.Nev.)
**(Cite as: 2006 WL 242465 (D.Nev.))**

distributes Field's copyrighted works by allowing access to them through "Cached" links, Google's conduct is fair use of those works as a matter of law.

III. Digital Millennium Copyright Act

In his motion for **summary judgment**, Field asked the Court to hold that **Google** is not entitled to the protections of the DMCA, 17 U.S.C. Sections 512(a)- (d), a series of copyright safe harbors for online service providers. **Google** opposed the motion and at the hearing on the parties' cross-motions for **summary judgment**, made an oral cross-motion for partial **summary judgment** in its favor based upon Section 512(b) of the DMCA.

[19] Field's motion for **summary judgment** with respect to Sections 512(a), (c) and (d) is not properly presented. Field does not discuss these safe harbors or explain why he believes that **Google** cannot rely upon them. Field's motion thus does not satisfy the basic requirement of Rule 56, that he show that there is "no genuine issue [of] material fact and that [Field] is entitled to judgment as a matter of law." *See* Fed.R.Civ.P. 56(c); *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir.2000) ("In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."). Accordingly, Field's motion with respect to these safe harbors is denied.

**\*15** The safe harbor of Section 512(b) is directed to system caches and states that "[a] service provider shall not be liable for monetary relief ... for infringement of copyright by reason of the intermediate and temporary storage of material on a system or network controlled or operated by or for the service provider" provided certain requirements are met. *See* 17 U.S.C. § 512(b)(1). Field contends that three elements of the safe harbor are missing.

[20] First, Field contends that in operating its cache, Google does not make "intermediate and temporary storage of that material" as required by Section 512(b)(1). Field is incorrect. *See Ellison v. Robertson, 357 F.3d 1072, 1081 (9th Cir.2004)* (AOL's storage of online postings for 14 days was "intermediate" and "transient" for purposes of Section 512(a)). In *Ellison,* a case involving the Section 512(a) safe harbor, plaintiff sought to hold America Online ("AOL") liable for copyright infringement for hosting and allowing end users to access copyrighted materials that had been posted by third parties to a system of online bulletin boards known as the Usenet. *Id.* at 1075-76. AOL stored and allowed users to access these Usenet postings for approximately 14 days. *Id.* Citing the DMCA's legislative history, the Ninth Circuit found that AOL's storage of the materials was both "intermediate" and "transient" as required by Section 512(a). *Id.* at 1081. Like AOL's repository of Usenet postings in Ellison which operated between the individuals posting information and the users requesting it, Google's cache is a repository of material that operates between the individual posting the information, and the end-user requesting it. Further, the copy of Web pages that Google stores in its cache is present for approximately 14 to 20 days. *See* Brougher Dep. at 68:19-69:2 (Google caches information for approximately 14 to 20 days). The Court finds that Google's cache for approximately 14 to 20 days--like the 14 days deemed "transient storage" in *Ellison*--

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 242465                                                           Page 20
--- F.Supp.2d ----, 2006 WL 242465 (D.Nev.)
**(Cite as: 2006 WL 242465 (D.Nev.))**

is "temporary" under Section 512(b) of the DMCA. The Court thus concludes that Google makes "intermediate and temporary storage" of the material stored in its cache, within the meaning of the DMCA. *See, e.g., Gustafso v. Alloyd Co.,* 513 U.S. 561, 570, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) ("identical words used in different parts of the same act are intended to have the same meaning").

 [21] Field next claims that Google's cache does not satisfy the requirements of Section 512(b)(1)(B). Section 512(b)(1)(B) requires that the material in question be transmitted from the person who makes it available online, here Field, to a person other than himself, at the direction of the other person. Field transmitted the material in question, the pages of his Web site, to Google's Googlebot at Google's request. Google is a person other than Field. Thus, Google's cache meets the requirement of Section 512(b)(1)(B).

 [22] Finally, Field contends that Google's cache does not fully satisfy the requirements of Section 512(b)(1)(C). Section 512(b)(1)(C) requires that Google's storage of Web pages be carried out through "an automat[ed] technical process" and be "for the purpose of making the material available to users ... who ... request access to the material from [the originating site]." There is no dispute that Google's storage is carried out through an automated technical process. *See* First Am. Compl. ¶ 19 (Field stating that "[t]hird-party web page content is added to the Google cache by an automated software process."); *see also* Brougher Decl. ¶ ¶ 4-5 (discussing automated technical process). There is likewise no dispute that one of Google's principal purposes in including Web pages in its cache is to enable subsequent users to access those pages if

they are unsuccessful in requesting the materials from the originating site for whatever reason. *See* Brougher Decl. ¶ 14; Levine Report ¶ ¶ 18-19. Google's cache thus meets the requirements of Section 512(b)(1)(C).

 **\*16** Because **Google** has established the presence of the disputed elements of Section 512(b) as a matter of law, Field's motion for **summary judgment** that **Google** is ineligible for the Section 512(b) safe harbor is denied. There is no dispute between the parties with respect to any of the other requirements of Section 512(b). Accordingly, **Google's** motion for partial **summary judgment** that it qualifies for the Section 512(b) safe harbor is granted.

ORDER

 For all the foregoing reasons, the Court hereby:

 (1) GRANTS **Google's** Motion for **Summary Judgment** of non-infringement and DENIES Field's Motion for **Summary Judgment** of Infringement;

 (2) GRANTS **Google's** Motion for **Summary Judgment** based on an implied license and DENIES Field's Motion for **Summary Judgment** that the license defense does not apply;

 (3) GRANTS **Google's** Motion for **Summary Judgment** based on estoppel and DENIES Field's Motion for **Summary Judgment** that the estoppel defense does not apply;

 (4) GRANTS **Google's** Motion for **Summary Judgment** based on fair use and DENIES Field's Motion for **Summary Judgment** that the fair use doctrine does not apply;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 242465                                                                                          Page 21
--- F.Supp.2d ----, 2006 WL 242465 (D.Nev.)
**(Cite as: 2006 WL 242465 (D.Nev.))**

 (5) GRANTS **Google's** Motion for Partial **Summary Judgment** based on Section 512(b) of the DMCA and DENIES Field's Motion for **Summary Judgment** that the DMCA safe harbors do not apply.

 SO ORDERED.

    FN1. The Levine Report is attached to the Levine Declaration as Exhibit 1.

    FN2. The three most popular search engines--Google, Yahoo!, and MSN-- all display "Cached" links with their search results, and operate them identically. *See* Brougher Decl. ¶ 17; Google, Yahoo!, and MSN collectively account for more than 80% of all Web searches. *See* Brougher Decl. ¶ 17.

    FN3. For example, the State of Indiana instructs its judges about this capability. *See* Levine Decl., Ex. 5 at 2 (article entitled "*Maximizing Web Searches With Google,*" available at http:// www.in.gov/judiciary/center/ed/libra ry/judcon-03/google.pdf, explains that "Clicking 'Cached' will simply give you an older version of the result page, which represents what the page looked like the last time the Google engine indexed the page. This service exists in case a website's server becomes unavailable.").

    FN4. A Web site owner can add the "no-archive" meta-tag to a Web page in a matter of seconds. *See* Brougher Decl. ¶ 21. Web site owners can also use a Google-specific "no-archive" meta-tag to tell Google that it cannot provide "Cached" links, while allowing other search engines (*e.g.,* Yahoo! and MSN) to do so. *See id.; see also* Levine Report ¶ 35.

    FN5. A Web site owner can also request that Google not display "Cached" links for given pages by using Google's automatic URL removal procedure. *See* Brougher Decl. ¶ 23. Google's Web site provides step-by-step instructions on using this procedure. *See id.; see also* O'Callaghan Decl. Ex. 5 (attaching a printout of http://www.google.com/remove.html ). Further, Web site owners can contact Google directly to make such a request. Google honors such requests. *See* Brougher Decl. ¶ 24.

    FN6. By contrast, a Web site owner can invite robots to visit a site without restriction by including a Robots.txt file that reads: "User-agent: * Disallow: " Levine Report at ¶¶ 31-32.

    FN7. Excerpts from the Field Deposition are attached to the O'Callaghan Declaration as Exhibit 1.

    FN8. Field did not contend that Google was liable for indirect infringement (contributory or vicarious liability).

    FN9. Field contends that Google's caching functionality harmed the market for his works by depriving him of revenue he could have obtained by licensing Google the right to present "Cached" links for the pages containing his works.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 242465                                                                      Page 22
--- F.Supp.2d ----, 2006 WL 242465 (D.Nev.)
**(Cite as: 2006 WL 242465 (D.Nev.))**

Under this view, the market for a copyrighted work is always harmed by the fair use of the work because it deprives the copyright holder of the revenue it could have obtained by licensing that very use. The Supreme Court has explained that the fourth fair use factor is not concerned with such syllogisms. Instead, it only considers the impact on markets "that creators of original works would in general develop or license others to develop." *See Campbell, 510 U.S. at 592; cf. Religious Tech. Ctr., 907 F.Supp. at 1378 n. 25* (suggesting fair use where unlikely to be market for licensing the temporary copying of digital works). Where there is no likely market for the challenged use of the plaintiff's works, the fourth fair use factor favors the defendant. *See Mattel, 353 F.3d at 806.*

--- F.Supp.2d ----, 2006 WL 242465 (D.Nev.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.