IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | : | |
| AGENCE FRANCE PRESSE, | : | |
| Plaintiff and Counter Defendant | : | |
| | : | |
| v. | : | Civil Action No. 1:05CV00546 (GK) |
| | : | Next Due Date: July 18, 2006 (Status Conference) |
| GOOGLE, INC., | : | |
| Defendant and Counter Claimant | : | |
| | : | |

## AGENCE FRANCE PRESSE PRECONFERENCE STATUS REPORT

In anticipation of a conference on Tuesday, July 18, Plaintiff/Counterclaimant
Agence France Presse ("AFP") submits this status report. The parties, based on the
Court's direction on January 11, 2006, in an effort to facilitate resolution of discovery
questions and of the case in general entered into a stipulation which the Court approved
on January 24, 2006.

1.      The underlying idea contained in this stipulation was to identify a limited
number of Google News pages (14) which covered dates throughout the period in
question in the litigation. From those dates, Google was to provide 24 Google News
Home pages each representing the top of the hour for a total of 336 Home pages. It was
anticipated that AFP would be able from those pages to identify its photographs, stories
and headlines and provide Google with agreed to information and discovery for the
purposes of injunctive relief and liability would flow from those limited documents.

Dockets.Justia.com

-2-

2.      The idea at the time of this stipulation was a sound idea and still is.  What often happens in discovery generally, and particularly, when dealing with new technology that the concepts and plans do not always work out exactly as the parties anticipated.  That was the case in regard to the Discovery Stipulations.  The initial problem which occurred was that Google was not able to provide AFP with any of the information for the later part of the period reflected by the agreed to dates.  These were the most recent dates.  Including these dates would have made the process a more complete and informative one in that it would have better reflected AFP's presence on Google News and provided more AFP images, story leads and headlines from which to work.

3.      AFP like all other companies which provide information online in the technology age has found its presence growing with every day, week and year.  Although AFP has certainly been represented on the web and Google News since its outset, its online presence has grown regularly as has its appearance on Google News (until Google stopped posting AFP stories as a result of this lawsuit).  Therefore, the removal of the later time periods from the sample eliminated what would have been a very fertile search area.  Nevertheless, based on AFP's desire to keep the stipulation on track agreed to additional dates in the earlier timeframe.

4.      Google went back into its archives and began attempting to recover the information required on the new dates.  This process took Google longer than expected and AFP agreed to Google's request for more time.  Subsequently, Google contacted AFP indicating its inability to even provide the information promised on the earlier dates.

It appeared that the way Google had saved Google News pages it did not have live links and, more troubling, they could not provide any photograph in a viewable format.

5.    The pages provided by Google instead of displaying photographs had an empty box with an "x" in it. AFP had anticipated, upon receiving the Google News pages with photos, being able to look at the photos and fairly rapidly be able to identify its photos and cross-check them against its database.

6.    However, that was not to be. Instead an extremely complicated and incredibly time-consuming process had to be undertaken, one that AFP, in its worse nightmares, had not contemplated when it entered into the stipulation. For example, when AFP went to the blank "x" place card where the original photograph had appeared in order to ascertain whether or not it was an AFP photograph if it clicked on the blank box. It received an error message. Instead, AFP had to "right click" on the box calling up another menu of options and from that menu it had to select the "Properties menu." Then it went into "Properties" and had to find a specific string of code then after isolating the string of code looking through it in order to identify the portion of the code that contained the internet address for the photo. After finding the string of code and identifying the internet address, AFP had to undertake a "Paste and Cut" of that portion of the code containing an internet address. This had to be done very meticulously and accurately because missing a single character in the code would render the process unusable. Taking the copied section of code, they had to open their web browsers and paste in the internet address and run a search based on that address. If the paste and cut was accurate and all went well, it would take them to the original source.

7.    Unfortunately, since Google only provided the older dates, the vast majority of the addresses finally found after this excruciating process, turned out to be dead sites as the underlying publications from which Google copied the photos did not archive them for that long a period of time.

8.    Since Google had stripped away AFP's copyrighted information material from the photos on its pages (one of the complained about copyright violations in this complaint), AFP had to go through this process with every single one of the thousands of empty photo boxes on the Google pages which were provided to them. Without the AFP credit lines, this process which was always going to be difficult, became a Herculean task bordering on the impossible.

9.    When AFP did find one of its photographs, it then went back to the source of publication, printed out the photo and then had to go and compare it to its own database and then print out not only the Google page reference, but the source reference from its own database.

10.    Similar processes had to be undertaken for AFP in order to track its stories and headlines.

11.    Each of these tasks contained its own set of difficulties.  For example, as the headlines had no identifying material by characteristics or copyright information (which all had been stripped away by Google), simply looking at the thousands of headlines on these pages provided no indication whatsoever of which ones were by AFP.

12.    The task of going back to check on each of the thousands of headlines would require many months, if not years worth of effort.

13.    AFP has a two-person legal staff in Paris which was (to the greatest extent possible) taken off all of its other tasks for the last several months and put on the task of going through the process as described above.  When it became clear that they were not going to be able to scratch the surface in the timeframe necessary, they enlisted the assistance of the North American marketing staff which dropped almost all of its workload and put three full-time persons on this project.  When it became clear even with this additional help the project would not complete this task they cooped several other individuals from the Washington, D.C. office to help assist them.  Finally, AFP hired outside paralegals to assist them as well.

14.    AFP spent an incredible amount of time and expense on this endeavor for a single purpose, to make the agreed upon plan work.  The various AFP teams finally stopped working on Friday afternoon, July 14, 2006, so that the results of their efforts could be combined, bound and provided to Google before today's hearing so that it and the Court could be provided with the fullest representation of AFP's efforts.

15.    The AFP team were finally able to identify more than the minimum number of the 25 photos, French story leads and French headlines.  As to the English story leads, they found fewer.  This discrepancy in findings was, as explained above, a result of AFP's increasing English text presence on the web and in Google News in the later period for which Google had no records.

16.    AFP did not have time to go through the thousands of separate headlines to ascertain whether or not they linked back to AFP headlines.  Part of the problem, of course, was the fact that many of these sites were now dead sites as a result of Google not

providing the more recent dates. Therefore, just a nominal number of separate headlines (not part of story leads) were found.

17.     In discovery, AFP provided Google discovery with the Google News pages it had sampled just prior to when this suit was being filed.

18.     AFP would request adding those few English stories from these pages to the stipulated stories to increase the sampling.

19.     One large substantive problem exists in regards to the photographs as none of the pages Google provided AFP showed the photographs in the context of Google News. While AFP was able to go through the arduous process outlined above and identify the photographs, they are not shown on Google News.

20.     When these findings are presented to AFP experts, they will need to see photos in the context of Google News in order to make their determinations of whether the photos were transformative links (as Google claims) or as AFP believes simply copies of their photos which undercut the market for the underlying original works.

21.     AFP would suggest that for the purposes of proving ownership, registrations, etc., that they use the 14 days worth of photos from the sampling; but, for purposes of expert testimony, in order for them to arrive at their opinion, that its experts be allowed to examine the materials AFP has provided in discovery to Google and Google News in general so that they can see the photos in context.

22.     AFP understands from its review of the Google News, etc. there has been no discernable change in the way Google has displayed its photos in Google News from the outset to the present; therefore, allowing the experts to render their opinions based on how Google News uses photographs generally as well as on the AFP provided pages

would allow for this essential expert testimony to be made available. Google would of course have the opportunity to rebut any expert opinion or assumptions in its depositions of AFP's experts and with its own experts.

23.     Per the earlier Stipulation, AFP has still not had the time to provide ownership information as to the materials. As earlier articulated to the Court, AFP does not claim to own each piece of material which appears on its wire. A great majority of AFP material is created by its own writers, photographers or stringers under "work for hire" agreements. However, as any wire service they provide information from third-party sources. From the materials which AFP has found, part of the agreement was that AFP would sort through that information and identify those which it claims copyright ownership as differentiated from third-party materials which simply appeared on their wire.

24.     Now that AFP has the photos and stories, it must go back and identify specific photographers and authors, contact its human resources department and find out which of those are employees and stringers. As to the stringers, it would then need to contact the various regional offices around the world which hired the stringers in order to find out what the arrangement was in regard to copyright ownership of their works and whether or not there is any documentation in regard to the copyright ownership.

25.     As to which copyright registrations apply to the particular works, AFP can certainly provide a chart to Google although that information is obvious as the copyright registrations have been previously provided to Google. Since they are Group Registrations for Automated Databases, the registrations cover a calendar quarterly

timeframe, so whatever the dates in which these works appeared and were first published would be assigned to those quarterly registrations.

26.    Google in its status report asked the Court for a continuation of the various existing dates by 90 days.  AFP believes it is appropriate to extend timeframes now that the parties and the Court have a better understanding of the complexity of this type of discovery (all these matters are relatively new due to the ever changing technologies). AFP joins in Google's request.

27.    AFP anticipates that it would take (particularly in light of the summertime and vacation schedules of its staff around the world) approximately 60 days in order to complete the identification and status and ownership of the various selected works and to put them in proper format to turn over to Google.

28.    While AFP will make every effort to produce that information in a shorter timeframe, it does not want to provide unrealistic dates to the Court that would need modification again.  Therefore, AFP would believe that perhaps 150 days rather 90 days sought by Google is a more realistic timeframe, that it be given 60 days to finish the work that they have begun in terms of identification and then the 90 day-extension would start.

Respectfully submitted,

                                        /s/
                                    Joshua J. Kaufman
                                    VENABLE LLP
                                    575 7th Street, N.W.
                                    Washington, D.C. 20004
                                    (202) 344-8538 (telephone)
                                    (202) 344-8300 (facsimile)
                                    jjkaufman@venable.com (email)

Date: July 17, 2006